OPINION
{¶ 1} Defendant-appellant Edgar A. Brandt appeals the January 9, 2002 Judgment Entry of the New Philadelphia Municipal Court which found him guilty of one count of driving under the influence of alcohol and sentenced him accordingly. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On January 15, 2001, Trooper A.E. Wood of the Ohio State Highway Patrol charged appellant with driving under the influence of alcohol, in violation of R.C. 4511.19(A)(1), and (A)(6); a marked lane violation, in violation of R.C. 4511.33; and failure to wear a safety belt, in violation of R.C. 4513.263(B)(1). While following appellant, Trooper Wood witnessed appellant cross the center line on two occasions and the fog line on one occasion. Upon speaking to appellant, Trooper Wood noticed appellant had a odor of alcohol beverage about his person, glassy bloodshot eyes and slurred speech. Trooper Wood administered the horizontal gaze nystagmus test, but was unable to perform the remainder of the field sobriety tests because appellant had an injured hip. Trooper Wood transported appellant to Post 79 in New Philadelphia, Ohio. Appellant submitted to the breath test. The BAC Datamaster evidentiary ticket stated appellant had a breath alcohol content of .172.
 {¶ 3} Appellant entered pleas of not guilty to all charges. On February 16, 2001, appellant filed a Motion to Suppress. This motion was amended on May 2, 2001, with court approval. Thereafter, appellant filed an additional suppression motion on June 1, 2001. The suppression motions contained detailed attacks upon equipment used to test the BAC Datamaster and are mirrored in appellant's assignments of error as stated, infra. On September 12, 2001, the trial court conducted a hearing on appellant's motion to suppress. On November 20, 2001, the trial court denied appellant's motions in total and scheduled the matter for trial. On January 9, 2002, appellant entered a plea of no contest to the offense of DUI, in violation of R.C. 4511.19(A)(6). At the State's request, the trial court dismissed with prejudice the offenses of failure to wear a safety belt and marked lane violations. Further, at the State's request, the trial court dismissed without prejudice the charge of violation of R.C. 4511.19(A)(1). The trial court accepted appellant's plea and found him guilty of the sole offense of R.C. 4511.19(A)(6), and sentenced him accordingly via Judgment Entry filed January 9, 2002.
 {¶ 4} It is from that judgment entry appellant prosecutes this appeal, assigning the following errors for our review:
 {¶ 5} "I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DETERMINED OAC 3701-53-02 APPROVES THE BAC DATAMASTER EVIDENTIARY BREATH TESTING INSTRUMENT FOR USE IN ALLEGED VIOLATIONS OF R.C. 4511.19(A)(6).
 {¶ 6} "II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN FAILED TO DETERMINE THE OHIO DEPARTMENT OF HEALTH/DIRECTOR OF HEALTH ABUSED HIS DISCRETION IN PERMITTING AN UNREGULATED DEVICE, THE GUTH 34C SIMULATOR, WHICH USES REGULATED AND APPROVED ALCOHOL SOLUTIONS, TO VERIFY THE CALIBRATION AND CORRECT WORKING STATUS OF THE REGULATED BAC DATAMASTER EVIDENTIARY BREATH TESTING INSTRUMENT.
 {¶ 7} "III. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO DETERMINE THE STATE HAD NOT ESTABLISHED THE PROPER FOUNDATION THAT THE ACTUAL TEMPERATURE OF THE SIMULATOR .SOLUTION WAS 34 DEGREES CELSIUS, PLUS OR MINUS .2 DEGREE CELSIUS (33.8-34.2 DEGREE CELSIUS), AND PERMITTED THE DEFENDANTS JANUARY 15, 2001 BAC TEST RESULT TO BE USED AS EVIDENCE AGAINST HIM FOR THE ALLEGED OFFENSE OF R.C. 4511.1 G(A)(6).
 {¶ 8} "IV. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FOUND SUBSTANTIAL COMPLIANCE WAS MET BY APPLYING THE +/- .005 G. ALCOHOL/210 L. BREATH KNOWN ERROR FACTOR, BASED UPON A TARGET VALUE OF .100 G. ALCOHOL/210 L. BREATH, TO THE R. C. 4511.1 9(A)(6) STATUTORY PROSCRIBED LEVEL OF .17 G/21 0 L.
 {¶ 9} "V. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO DETERMINE THE STATE CANNOT SHOW AND PROVE WHEN A .170 BAC, PROHIBITED BY AND ACCORDING TO R.C. 4511. 1 G(A)(6), ACTUALLY OCCURS, IS REACHED OR ATTAINED WITH THE CERTAINTY REQUIRED TO CONVICT THE DEFENDANT/APPELLANT FOR AN OFFENSE OF R.C. 4511.19(A)(6).
 {¶ 10} "VI. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED AND CONCLUDED THE DEFENDANT/APPELLANTS JANUARY 15, 2001 BAC TEST RESULT (.172) MET THE BURDEN OF PROOF NECESSARY TO FIND HIM GUILTY TO THE ALLEGED OFFENSE OF R.C. 4511.19(A)(6) WHEN THE STATE STIPULATED THE INSTANT BAC TEST RESULT COULD BE .005 LESS (.167).
 I {¶ 11} In appellant's first assignment of error, he maintains the trial court erred in finding OAC section 3701-53-02(A) approved the BAC Datamaster as an appropriate instrument to test breath alcohol for alleged violations of R.C. 4511.19(A)(6). Appellant points out R.C.4511.19(A)(6) was amended after the enactment of OAC section 3701-53-02(A). Because OAC 3701-53-02(A) never contemplated the use of the BAC Datamaster to test an (A)(6) violation, appellant contends the Datamaster could not be approved to determine such a violation. Therefore, appellant maintains any violation of R.C. 4511.19(A)(6) is unenforceable until the OAC is amended to include an instrument approved to determine a violation of (A)(6). Accordingly, appellant contends his test result cannot be used against him. We disagree.
 {¶ 12} OAC 3701-53-02(A) states as follows:
 {¶ 13} "(A) The instruments listed in this paragraph are approved as evidential breath testing instruments. In addition to any other purposes for which they may be used, evidential breath testing instruments are approved for use in determining whether an individual's breath contains a concentration of alcohol prohibited or defined by division (A)(3) or (B)(2) of section 4511.19, division (A)(4) of section 1547.11, division (B) of section 2903.06, division (B) of section 2903.07, division (B) of 2903.08 of the Revised Code, or any other statute or local ordinance prescribing a defined or prohibited breath-alcohol concentration. The approved evidential breath testing instruments are:
 {¶ 14} "* * *
 {¶ 15} "(4) BAC Datamaster." (Emphasis added).
 {¶ 16} In its November 20, 2001 Judgment Entry, the trial court concluded the catch-all provision set forth in the above-quoted section included the Datamaster as an acceptable breath testing machine for violation of R.C. 4511.19(A)(6). We agree with the trial court. Even though the section did not specifically refer to R.C. 4511.19(A)(6), we find the catch-all provision adequately expressed the legislative intent to permit the BAC Datamaster to be used in any statute or local ordinance prescribing a defined or prohibited breath alcohol concentration.
 {¶ 17} Appellant's first assignment of error is overruled.
 II {¶ 18} In appellant's second assignment of error, he maintains the trial court erred in failing to determine whether the Director of the Ohio Department of Health (hereinafter "Director") abused his discretion in permitting the Guth Simulator to verify the Datamaster was calibrated correctly and in proper working order. Appellant points out the Director has set forth no regulations or standards dealing with the Guth Simulator. Appellant contends the calibration of the Datamaster is compromised when an uncontrolled and unregulated simulator is used to insure the precision of the testing instrument. Appellant points out even the state toxicologist agreed the simulator manual recommend re-certification of the simulator on a yearly basis. The Director has not required such re-certification. In light of these facts, appellant maintains the Director abused his discretion in failing to set forth specific regulations with regard to the simulator. We disagree.
 {¶ 19} Specific regulations regarding the maintenance and operation of the simulator and the Datamaster are areas of scientific expertise. Accordingly, the legislature delegated the responsibility of promulgating regulations with regard to the Datamaster and, if necessary, the simulator, to the Director. We are well aware this Court's expertise does not lie in the scientific arena. Instead, it is our duty to review the record and determine legal challenges based upon such a record. In absence of evidence demonstrating the use of the simulator in some way impacted appellant's individual test, we are unwilling and unable to find the protocol designed and implemented by the Director is in any way defective, let alone an abuse of discretion.
 {¶ 20} Further, we find appellant's assignment of error misdirected. Generally, a defendant cannot challenge legislative acts as an abuse of discretion. Rather, any challenge must lie in the constitutionality of the statute. We recognize footnote 2 of State v.Vega clouds this issue, wherein the Supreme Court stated: "It is noted that there has been no assertions that there was an abuse of discretion by the Director of Health in promulgating these rules." 12 Ohio St.3d 185, Fn 2. Although the Supreme Court suggested a review of the Director's decision was possible under an abuse of discretion standard, we question whether such a review is appropriate here.
 {¶ 21} The legislature gave the Director the authority to promulgate the administrative code regulating use of breath testing instruments. We view this as a delegation of a legislative function from the legislature to the Director. Accordingly, it would be inappropriate for us to determine whether the Director abused his discretion in promulgating those rules. While we clearly could review the constitutionality of legislative actions, statutes or the administrative code, appellant has made no such constitutional challenge.
 {¶ 22} Notwithstanding our concerns about the propriety of reviewing the Director's action as an abuse of discretion, we feel compelled by the second footnote in State v. Vega to address the issue. Even if we would have found it appropriate to review the Director's decisions in the promulgation of rules with regard to the simulator, we would find no abuse of discretion herein based upon the lack of scientific evidence to support appellant's claim. Accordingly, appellant's second assignment of error is overruled.
 III {¶ 23} In appellant's third assignment of error, he maintains the trial court erred in finding the State established a proper foundation the "actual" temperature (as opposed to the temperature reflected on the thermometer) of the simulator solution for his test was 34 degrees celsius plus or minus .2. Therefore, appellant argues the trial court also erred in permitting the test to be used against him. We disagree.
 {¶ 24} Evidence of alcohol concentration in a person's breath which is analyzed in accordance with the procedures provided in the OAC are admissible. R.C. 4511.19(D); COAC 3701-53-02 and 3701-53-04. "Absent a showing of prejudice, the result of alcohol concentration tests administered in substantial compliance with the OAC 3701-53-04 are admissible." State v. Krotine (Jul. 9, 1999), Erie App. No. E-98-097, unreported, citing State v. Plummer (1986), 22 Ohio St.3d 292,490 N.E.2d 902, syllabus; State v. Nichols Coshocton App. No. 01CA016.
 {¶ 25} Appellant correctly points out the State bore the burden of demonstrating substantial compliance with the OAC for the instrument check conducted on the Datamaster before and after appellant's breath test took place. In order to insure compliance, an instrument check is conducted in accordance with the instrument checklist for the specific breath testing instrument; in this case the Datamaster. A senior operator must comply with the checklist by performing certain actions in a prescribed order and then checking completion of those actions on the instrument check form.
 {¶ 26} Appellant claims the officers performing the instrument checks could not determine the "actual temperature" of the Simulator, because it was possible the thermometer gave an incorrect reading.
 {¶ 27} Trooper Travis Adkins of the Ohio State Highway Patrol conducted the instrument check of the Datamaster before appellant's breath test. At the suppression hearing, the parties elicited the following testimony from Trooper Adkins:
 {¶ 28} "Q. * * * I think the crux of the matter here, with the simulator at 34 degrees plus or minus .2 tenths of a degree would you call that?
 {¶ 29} "A. Yes.
 {¶ 30} "Q. Two tenths of a degree Celsius, what are you looking at to determine you're at 34 degrees plus or minus —
 {¶ 31} "A. * * * the * * * temperature gauge on the simulator.
 {¶ 32} "Q. Okay, and what was the reading at this time?
 {¶ 33} "A. 34 degrees.
 {¶ 34} "Q. Are you able to say with mathematical precision that it was exactly 34 degrees?
 {¶ 35} "A. The, the gauge was on 34 degrees.
 {¶ 36} "Q. Okay, so you read it as it showed you?
 {¶ 37} "A. Correct.
 {¶ 38} "* * *
 {¶ 39} "Q. Okay, as a senior operator, Travis, what does it, what does it mean to you * * * as far as the 34 degree Celsius issue how do you understand that?
 {¶ 40} "A. I understand if it's under 34 degrees or actually 38. — 33.8 degrees that the test might be a little bit low or if it's over the 34.2 degrees the test might be a little bit high.
 {¶ 41} "Q. Okay.
 {¶ 42} "A. That's my understanding, 34 degrees.
 {¶ 43} "Q. But as it came out here in this instant were you within the acceptable ranges of what you have as far as the simulator solution and your margins of error?
 {¶ 44} "A. Correct.
 {¶ 45} Q."Okay, so if you came out that, at that level, are you essentially done with it from that point, do you think you have an operable machine, right?
 {¶ 46} "A. Once I go through the checklist?
 {¶ 47} "Q. Um. hum.
 {¶ 48} "A. Yes.
 {¶ 49} "* * *
 {¶ 50} "BY [counsel for appellant] MR. BLACKWELL:
 {¶ 51} "Q. Trooper Adkins, when you were running your simulator test, test on January 14th for this instrument what check form did you use, what thermometer did you use on the simulator to observe the temperature?
 {¶ 52} "A. The one that's on the simulator.
 {¶ 53} "Q. There's only one, isn't there?
 {¶ 54} "A. Correct.
 {¶ 55} "Q. And that is a dial thermometer?
 {¶ 56} "A. Yes, it is.
 {¶ 57} "Q. On the top of the machine?
 {¶ 58} "A. Yes.
 {¶ 59} "Q. Okay, in what increments of degrees is that dial thermometer graduated?
 {¶ 60} * *
 {¶ 61} "A. Half degrees.
 {¶ 62} "Q. Okay, so after 34, well again without trying to put words in your mouth here, the dial thermometer I believe is graduated and has a numerical value at 30 and 50 degrees, but nothing in between, correct?
 {¶ 63} "A. Well there's a 34.
 {¶ 64} "Q. There is a 34 on it?
 {¶ 65} "A. Yes.
 {¶ 66} "Q. Okay, and a half degree mark below, half degree mark above would make it 33.5 and 34.5 degrees, correct?
 {¶ 67} "A. Correct.
 {¶ 68} "Q. You're saying then first of all that the needle on the thermometer when you observed it was at exactly 34 degrees?
 {¶ 69} "A. Exactly 34 degrees.
 {¶ 70} "Q. Didn't waiver either side?
 {¶ 71} "A. No.
 {¶ 72} "* * *
 {¶ 73} "Q. Okay, but you are absolutely certain 34 degrees exactly is what it was?
 {¶ 74} "A. It is exactly that.
 {¶ 75} "Q. All right. Do you know if the temperature on that thermometer as you observed it was the actual temperature of the simulator?
 {¶ 76} "A. Can't testify on that, I don't know. All I know is the thermometer that I looked at on the simulator read 34 degrees." Tr. at 11-15.
 {¶ 77} The State also presented the evidence of Trooper Donald Ryan. Trooper Ryan conducted the scheduled test of the Datamaster after appellant's test. Trooper Ryan testified as follows:
 {¶ 78} "* * *
 {¶ 79} "Q. All right, and if you again working down the checklist, going through items one through six, did you conduct the test in the manner that it's indicated on the form that you filled out?
 {¶ 80} "A. Yes, sir, I did.
 {¶ 81} "Q. Okay, * * * What does that mean to you, Sergeant, when you see . . (Inaudible) . . thermometer at 34 . . . (Inaudible)?
 {¶ 82} "A. It means that the simulator is ready to check calibration of the machine.
 {¶ 83} "Q. Okay, you put another thermometer in there to check that it's at 34?
 {¶ 84} "A. No, sir.
 {¶ 85} "Q. Were you ever trained to do that?
 {¶ 86} "A. No, sir.
 {¶ 87} "Q. Do you know of any regulation, any rule, anything out there that mandates that you do check it with a cross-checking thermometer?
 {¶ 88} "A. No, sir.
 {¶ 89} "Q. Ever put a digital thermometer on it?
 {¶ 90} "A. No, sir.
 {¶ 91} "Q. All right. So you go by the 34 C that you see on the dial thermometer and that's it?
 {¶ 92} "A. Yes, sir.
 {¶ 93} "Q. Okay, having done that do you think then that you've conducted this test according to the way you're supposed to conduct it under the OAC?
 {¶ 94} "A. Using the approved solution, the approved temperature and following the checklist on the Datamaster instrument check form, if it calibrates within tolerance, yes, I've done it correctly.
 {¶ 95} "* * *
 {¶ 96} "BY MR. BLACKWELL:
 {¶ 97} "Q. Sergeant.
 {¶ 98} "A. Sir.
 {¶ 99} "Q. Did you use the dial thermometer on top of the simulator to check temperature —
 {¶ 100} "A. That's correct.
 {¶ 101} "Q. — when you did the January 21 test?
 {¶ 102} "A. Yes, sir.
 {¶ 103} "Q. That would be about the first time you've ever said sir to me, isn't it? Anyhow, okay, continuing on. Can you state the exact temperature you observed on January 21st?
 {¶ 104} "A. I saw it read 34 degrees.
 {¶ 105} "Q. Did it waiver on either side?
 {¶ 106} "A. It didn't appear to. It appeared to be 34 degrees.
 {¶ 107} "Q. If the thermometer reads 34 degrees can you state for a fact that the simulator is operating at 34 degrees?
 {¶ 108} "A. I don't believe I'd be qualified to say that. All I can do is read the thermometer. If it says 34 degrees it's 34 degrees.
 {¶ 109} "Q. Then you're hoping that the thermometer's right, right?
 {¶ 110} "A. Yes." Tr. at 16-21.
 {¶ 111} We reviewed a similar argument in State v. Nichols,
supra. Like the Nichols Court, we find appellant herein is unable to demonstrate the State failed to substantially comply with the applicable regulations. Appellant essentially argues the State can never comply with the checklist because the current state of regulatory control over the test might not determine the "actual" temperature of the simulator. However, this allegation alone, when the testimony indicated compliance with all other testing procedures, is insufficient to warrant relief. Like Nichols, the instrument check in the matter sub judice was conducted before and after appellant's breath test. In both tests, the Datamaster returned test results indicating the Datamaster had accurately tested samples. Under such circumstances a Datamaster is deemed properly calibrated for use. OAC 3701-53-04.
 {¶ 112} Generally, only when both the simulator and breath testing instrument are working properly, will the instrument check provide a result within the allowable target value range. Like the Nichols Court,
we concede if the Datamaster is somewhat inaccurate in one direction, and the breath simulator is somewhat inaccurate in another direction, these offsetting problems could, theoretically, result in a falsely "accurate" test of the Datamaster. However, we have no scientific evidence or testimony to demonstrate that such a hypothetical situation either is possible, or more importantly, actually occurred in this instance. It remains the responsibility of the Director to promulgate regulations assuring the accuracy of breath testing instruments. We must rely the scientific expertise of the Director and conclude, when all testing procedures are done in accordance with the code, the breath testing instrument is properly calibrated and functioning effectively.
 {¶ 113} Trooper Adkins and Trooper Ryan testified the thermometer temperature of the simulator read exactly 34 degrees. Additionally, the instrument checks of the Datamaster before and after appellant's test were each within the acceptable variance of .005. Accordingly, we find the Datamaster was operating correctly at the time appellant's test was given. Because appellant's cannot demonstrate actual prejudice with regard to his test, his third assignment of error is overruled.
 IV, V {¶ 114} In appellant's fourth assignment of error, he maintains the trial court erred in finding the State substantially complied with the code when it applied a plus or minus .005 gram of alcohol per 210 liters of breath as the acceptable variance to a violation of4511.19(A)(6), which prohibits a level of .17 grams of alcohol per 210 liters of breath. Appellant contends there should be a new total error variance (apparently applied to the instrument check) for breath alcohol tests testing breath alcohol contents over .17 grams of alcohol per 210 liters of breath. Appellant asserts even a properly calibrated Datamaster will provide a result outside the acceptable variance of plus or minus .005 when it tests an individual with a breath alcohol content of .17 or higher.
 {¶ 115} In appellant's fifth assignment of error, he maintains the trial court erred in failing to find the State could not prove appellant's test was actually a .17 beyond reasonable doubt.
 {¶ 116} Because amendments to R.C. 4511.19 create a per se violation of the breath alcohol content over .17, appellant contends the State can never demonstrate beyond a reasonable doubt an individual's breath alcohol content is over .17 plus or minus .005 as required by the OAC. This argument is based upon appellant's fourth assignment of error. We disagree with appellant's contentions.
 {¶ 117} Initially, we note in light of the fact the legislature has created new penalties for higher contents of breath alcohol, it may be wise to test breath testing instruments with known solutions of .17. However, we can not find the Director's failure to promulgate such regulations demonstrates appellant's test was inaccurate or that all tests over the level prescribed in R.C. 4511.19(A)(6) are invalid. Notwithstanding what facially appear to present common sense arguments, we are again without any scientific evidence to conclude appellant's test was not scientifically, let alone legally valid.
 {¶ 118} As set forth above, the State presented testimony the Datamaster was properly calibrated, and had passed instrument checks both before and after appellant's test. Further, we note the Director chose not to promulgate any new regulations setting forth new acceptable variances for solutions testing a higher breath alcohol content. Accordingly, we must presume the Director of Health found it scientifically acceptable to use the test result of a higher breath alcohol concentration with the current testing methods.
 {¶ 119} Again, appellant has shown no actual prejudice from these testing procedures. Appellant points to the testimony of the state toxicologist, elicited on cross-examination. There, the toxicologist testified he prepared and sample tested a batch of instrument test solutions. These solutions were subsequently used in the Datamaster which tested appellant. The toxicologist determined that some of those solutions could not be used for the instrument check. The toxicologist noted, in that batch, that as the known value of the test solution increased, the total error variance also increased. In other words, the higher the alcohol content of the sample, the higher the error variance. This situation caused the toxicologist to not send any solution with a known value over .130 because those solutions would fail the instrument check by producing a value in excess of the acceptable .005 variance.
 {¶ 120} Appellant notes his breath test resulted in a reading of .172. Appellant contends that if a variance of .005 was applied to his test, the result was actually as low as .167. If his test result had actually been .167, appellant would not be in violation of R.C.4511.19(A)(6), and therefore, subject to a lesser penalty. Further, appellant uses the above-referenced testimony to suggest his breath result was actually even lower than .167 because tests of solutions over .130 had higher total error variances. We do not find this argument persuasive.
 {¶ 121} We acknowledge we do not know if a reading on the breath test is the "actual" breath content of the person. Rather, the prohibited breath alcohol content set by the legislature is that as it is measured on an approved, properly calibrated, and properly checked breath testing instrument. This is an important point, because appellant seems to argue the error variance should be applied to individual breath tests. The code does not provide for such an analysis. The error variance exists only for the instrument check. Once the machine is checked, the variance is no longer part of the analysis.
 {¶ 122} The law finds a per se violation of the statute when the test result exceeds the proscribed level, after analysis on a proper testing instrument. The Director was granted the discretion to create the protocol whereby such testing would create a valid result, accurate enough to be considered a per se statutory violation. The record demonstrates the Datamaster used to test appellant was properly calibrated, and checked pursuant to the instrument checklist as provided by the administrative code. Therefore any test result obtained from that machine, including appellant's test result, is presumed valid. Therefore, the fact appellant's test result was a .172 was sufficient to demonstrate a per se violation of the statute.
 {¶ 123} Appellant's fourth and fifth assignments of error are overruled.
 VI {¶ 124} In appellant's sixth assignment of error, he maintains the trial court erred in concluding appellant's test result of .172 was sufficient to establish his guilt beyond a reasonable doubt where the State stipulated the BAC test result could have been as low as .167. We disagree.
 {¶ 125} We note the State in fact stipulates appellant's breath result could have been as low as .167. However, as noted above, we found appellant's test, as given, was accurate. Once the machine was properly calibrated and properly checked, the legislature has determined a per se violation of R.C. 4511.19(A)(6) occurs when an individual's breath test results exceed .17.
 {¶ 126} Accordingly, we find the trial court correctly concluded a breath test result of .172, conducted on a properly calibrated and properly checked instrument, was sufficient to establish evidence of the (A)(6) violation.
 {¶ 127} Appellant's sixth assignment of error is overruled.
 {¶ 128} The January 9, 2002 Judgment Entry of the New Philadelphia Municipal Court is affirmed.
By: Hoffman, P.J., Gwin, J. and Edwards, J. concur.
topic: dui — attacks on validity of regulation equipment for violations of RC 4511.19(A)(6).